IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PEDRO WILLIAM BACA,

    Petitioner,                    No. CIV S-05-0506 RRB KJM P

    vs.

A.K. SCRIBNER, Warden, et al.,

    Respondents.             FINDINGS AND RECOMMENDATIONS

                              /

        Petitioner, a state prison inmate proceeding pro se, challenges his Sacramento County convictions for murder, attempted murder and assault with a deadly weapon and the findings that he had used a gun and acted to benefit a street gang.

I. Background

        Petitioner and co-defendant Rocky Gonzales were jointly charged in an information filed September 20, 2002 with the murder of Antonio Garnica, the attempted murder of Lee Ward, and assault with a deadly weapon on Lee Ward; various weapons and gang enhancements also were alleged. CT 130-133. Although the defendants were tried together, two juries were impaneled. See, e.g., RT 38, 131.

/////

/////

1

1	After a review of the record, this court accepts the Court of Appeal's factual
2 recitation of the material presented to petitioner's jury, presented as part of its evaluation of
3 petitioner's challenge to the sufficiency of the evidence:

> Defendant's lifelong friend, John Medina, testified that he saw defendant shoot at the victim, Anthony Garnica. Medina was the only witness to the shooting. He therefore was subjected to a searing cross-examination, during which the defense exposed his motive to lie, his propensity to lie, and his history of lying. On appeal, defendant contends there was insufficient evidence to connect him with the commission of the charged offenses independent of his accomplice's testimony. The theory of the defense was that Medina, not defendant, shot the victims.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . .After finishing work at his family's restaurant about 7:00 p.m., Garnica and his coworker, Lee Ward, walked to a Quik Stop market, where they met another friend, Jesus Avila. Garnica's girlfriend, their son, and another child drove into the lot. Garnica gave his girlfriend money to buy alcohol. As she did what she was told, she encountered Medina, Gonzales, and defendant, one of whom spoke to her and thus provoked Garnica. He stated, "'Shut up, she's mines [*sic*].'" Medina retorted, "'Who the fuck you telling to shut up?'" He also asked Garnica if he was a "scrap," a derogatory gang term referring to members of a Hispanic gang associated with Southern California. At some point, Medina grabbed the beer bottle Garnica was holding. Eventually, Medina apologized to Garnica for approaching his girlfriend and the two shook hands. Defendant did not appear to be involved in the argument.
>
> Gonzales, Medina, and defendant bought their beer and left, although there is conflicting testimony as to whether defendant rode in the cab or the bed of the truck or whether he left on foot. Medina testified that he could not find defendant and they drove to defendant's house looking for him. All the witnesses agree that a few minutes later, Gonzalez and Medina got into a fight with Garnica and Ward. Ward testified he did not see the shooter, but he did not see defendant during the fight. Ward recovered; Garnica did not. The cause of death was a distant-range gunshot wound to the lower back.
>
> Medina testified that Garnica and Ward jumped him, they exchanged blows, he heard a gunshot, and then he saw defendant walk around the corner with a black revolver in his hand. Defendant, according to Medina, then shot at Garnica.

The prosecution stipulated the immunity agreement with Medina had been withdrawn because he had not been truthful during the preliminary hearing. Moreover, defense counsel exposed a series of lies Medina told during the investigation and prosecution of the charges. Medina insisted he was not a member of a gang despite photographs showing him throwing gang signs with other gang members, his red attire, his friendship with known gang members, and his use of gang terminology.

Avila testified that the shooting occurred just a few minutes after the first altercation. After everyone left, he spoke to the owner of the Quik Mart for four or five minutes and then drove down Franklin Boulevard. He saw Garnica face down on the ground and drove to the restaurant to inform Garnica's parents. He estimated that no more than three to six minutes elapsed between the time the victims left the store and the time he saw Garnica on the ground.

Defendant had broken off his relationship with his girlfriend, Jessica Morales, a day or two before the shooting. Nevertheless, she visited him in prison about a hundred times. She testified that she was unable to remember much of anything because she smoked a lot of marijuana every day. During the investigation, she told a police officer that she spoke to defendant on the telephone six days after the shooting. He tearfully told her that he wanted to hold her once more because he had done something wrong and he was going to be gone for a long time. The meaning of defendant's statement was hotly contested at trial. The prosecution argued the statement was a blatant admission of guilt; defendant shot Garnica and was on the run. The defense argued that defendant admitted not to the shooting of Garnica., but to shooting at an inhabited dwelling. At the time of the telephone conversation, Morales did not know about the homicide. She believed defendant had shot at a relative's house. But during the conversation, she repeatedly told defendant not to tell her what he had done wrong or why he would be gone for a long time.

Morales also testified that defendant brought home a gun when they lived together. A .32-caliber cartridge was found beneath defendant's couch and the slug taken from Garnica's body was also a .32-caliber. Defendant's apartment was across the street from the shooting.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Defendant does not dispute that he arrived at the Quik Mart with Medina and Gonzalez a few minutes before the shooting. Thus, he was present during the provocative confrontation. Moreover, Avila testified that defendant would not allow him to approach Garnica when the argument began. While perhaps he was not the initial antagonist, he aligned himself with his friends, both of whom were attired in standard gang issue: white t-shirts, khaki or black pants,

3

>red accessories, and tattoos.  While Morales insisted, to the extent she had any recall, that she had kept him from hanging out downtown with gang members, defendant too had a gang tattoo emblazoned on his chest.
>
>A gang expert educated the jury on the nuances of gang subculture, in which members are bound to defend one another, particularly when a comrade is shown disrespect.  Hence, the jury learned that in defendant's milieu, disrespect begets violence and revenge is a communal responsibility.  Hence, the jury was free to draw the reasonable inference that defendant, loyal to a gang code of honor, sought to avenge those who had disrespected his "homeboy."
>
>The inference was bolstered by two independent facts: defendant owned a gun and lived in close proximity to the shooting.  The jury could have concluded that defendant retrieved his gun from his apartment down the street from the Quik Mart and, seeing his friends engaged in a fight with Garnica and Ward, fired two or three shots. . . .

Answer, Ex. B at 2-8.

II. <u>Standards Under The AEDPA</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See <u>Ramirez v. Castro</u>, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

not address the merits of petitioner's Eighth Amendment claim).[1]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

---

[1] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

III. Failure To Instruct Jury To Begin Deliberations Anew

Petitioner's jury retired to begin deliberations at 2:55 p.m. on January 23, 2003, and recessed for the evening at 4:15 p.m. CT 643-644. They returned the next day at 9:00 a.m.; at 10:15, they sent the judge the following note:

> At this point in time, it is apparent to the jurors that we will probably not come to a decision by C.O.B. Monday. We have a juror who was told he would be done Monday. We request that we bring in our alternate to prevent having to start the deliberation process over.

CT 754 (minutes), 756 (note). The juror referenced was excused at 10:40 a.m. and an alternate was sworn and seated. CT 754. The newly constituted jury continued deliberations on January 27, 28, 29, 30 and 31, and on February 3, and reached its verdicts at 11:15 a.m. on February 4. CT 758, 762, 769, 772, 773, 776, 780. During these deliberations, the jury asked eight questions. CT 757, 761 (request for readbacks of two witnesses' testimony), 767, 768, 771, 775, 778, 779.

/////

Before the one juror was excused, there were no questions other than the request that the alternate be seated.

On appeal, petitioner argued that the court erred in failing to instruct the newly constituted jury to begin deliberations anew. The Court of Appeal rejected this argument:

> A more troubling issue is the trial court's failure to instruct the jury to begin deliberations anew once an alternate juror replaced another juror. (*People v. Collins* (1976) 17 Cal.3d 687, 693-694 (*Collins*).) Since the failure to instruct constitutes clear *Collins* error, the issue is whether the error is harmless. We conclude it is.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . .[T]he jury deliberated a very short time before the alternate was substituted and a comparatively long time thereafter. In fact, the reconstituted jury deliberated a full seven days and asked the court a total of nine questions during those deliberations. Given that the jury would have spent some portion of the initial two and one-half hours selecting a foreperson, we cannot say it is reasonably probable that the jury had engaged in such meaningful deliberations or that individual jurors had made up their minds that defendant was deprived of the full participation of 12 open-minded jurors during the seven days of deliberations that followed. More specifically, we conclude it is not reasonably probable that defendant would have been acquitted if the court had properly instructed the jurors to begin their deliberations anew.
>
> Yet defendant insists the error was prejudicial because the case was so close. We agree that the evidence is not . . .strong. . . .The only witness to identify defendant as the shooter was his accomplice, John Medina, and the corroborative evidence, while sufficient, was not overwhelming. Nevertheless, the evidence was not so weak as to shake our confidence in the deliberative process given the length of the time the reconstituted jury deliberated and the number of incisive questions the jurors posed.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> Nor does the content of the juror's request convince us otherwise. Defendant emphasizes that the jury sought to avoid its essential obligation; that is, to start deliberations anew once the alternate was seated. Our response is twofold. First, the note itself is somewhat ambiguous. Contrary to defendant's assertion, the jurors may have realized that a change in membership would require fresh deliberation, and therefore, because they had barely begun, they asked to seat the alternate before lengthy deliberations were wasted. Second, even if the jurors mistakenly believed that given

> the brevity of their deliberations they were not required to start over, we find it is not reasonably probable that a proper instruction would have affected the outcome of the deliberations.

Answer, Ex. B at 8-13.

In Williams v. Florida, 399 U.S. 78 (1970), the Supreme Court considered the constitutionality of a six-person jury. The Court rejected the challenge to the practice:

> [T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence. The performance of this role is not a function of the particular number of the body that makes up the jury. To be sure, the number should probably be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community.

Id. at 100. Cases that have considered the substitution of an alternate for a deliberating juror have examined whether the substitution undercut the "essential feature" of the jury, while recognizing that the Supreme Court has not specifically ruled on the constitutional propriety of replacing a juror after deliberations have begun. Claudio v. Snyder, 68 F.3d 1573, 1575-76 (3d Cir. 1995); Miller v. Stagner, 757 F.2d 988, 995, as amended, 768 F.2d 1090 (9th Cir. 1985). In both Claudio and Miller, the trial court instructed the reconstituted jury to begin deliberations anew.

Petitioner has cited no case nor has the court found Supreme Court authority requiring that such an instruction be given to the jury after an alternate has been substituted for a deliberating juror. In Peek v. Kemp, 784 F.2d 1479, 1484-85 (11th Cir. 1986), the Eleventh Circuit suggested that such an instruction is not constitutionally compelled. Consonant with Williams v. Florida, the Court of Appeals considered whether the trial court's failure to give such an instruction prejudiced the defendant, ultimately concluding that the "speculative" claims of prejudice were insufficient to show that the court's failure to instruct the jury violated the defendant's constitutional rights.

Accordingly, the state Court of Appeal followed the correct approach in examining whether the trial court's failure to instruct the jury prejudiced petitioner or otherwise denied him the "essential feature" of his right to trial by jury. This court cannot say that the state court unreasonably applied federal law in reaching its result.

After the alternate was substituted for the seated juror, petitioner's jury considered the case for seven days, asking questions about the evidence, the law and the instructions. See CT 771 ("we are unclear as to where people's exhibit #116 (picture of red hat w/white emblem) actually was found"); CT 775 ("in count 3 does Baca need to be a principal or be the actual person that threw the bottle"); CT 779 ("on page #80 'intentionally and personally discharged a firearm' is defined differently than 'personally used a firearm' on page #81. Which do we use for enhancement #1 for count 1"). This jury's lengthy, spirited and thoughtful deliberations show a jury involved in its essential function.

Moreover, this court cannot fault the Court of Appeal's interpretation of the jury's note asking for the substitution of an alternate. While the jury did say it wanted to avoid starting deliberations over, there is no indication in the record that the reconstituted jury shirked its duty to reach the question of petitioner's culpability as a group. Petitioner has not shown that the state court erred in rejecting this claim of error. See also Johnson v. Louisiana, 406 U.S. 356, 362 (1972) (no requirement of jury unanimity in criminal case).

IV. Sufficiency Of The Evidence

In the usual challenge to evidentiary sufficiency, a habeas court must review the record in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In making such a determination, a habeas court must defer almost totally to the trier of fact's credibility determinations. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).

/////

Petitioner does not raise the typical challenge to evidentiary sufficiency; rather, he argues that Medina's testimony was not sufficiently corroborated, as required by California Penal Code § 1111, and that Medina's credibility was shaky, at best. Petition (Pet.) at 13-19.

The Court of Appeal rejected this contention:

> . . .We conclude that defendant's affiliation with Medina and Gonzalez minutes before the shooting, in the context of the gang culture; when considered with his ownership of a gun, his access to it, and the similarity of the ammunition to the bullet from the victim; and bolstered by his admission, constitutes sufficient corroboration of Medina's testimony.

Answer, Ex. B at 8.

"The Constitution does not prohibit convictions based primarily on accomplice testimony." Scrivner v. Tansy, 68 F.3d 1234, 1239 (10th Cir. 1995). Nor is there any constitutional requirement that accomplice testimony be corroborated:

> [California Penal Code] Section 1111 does, however, prevent convictions based on only uncorroborated accomplice testimony. As a state statutory rule, and to the extent that the uncorroborated testimony is not "incredible or insubstantial on its face," the rule is not required by the Constitution or federal law.

Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000); see also Cummings v. Sirmons, 506 F.3d 1211, 1237 (10th Cir. 2007) (there is "no constitutional requirement" that accomplice testimony be corroborated for evidence to be deemed sufficient).

Petitioner is correct that it was within Medina's interest to identify petitioner as the shooter. Petitioner also is correct that Medina's credibility is suspect: the prosecutor withdrew the proffered immunity because Medina had lied at the preliminary hearing. RT 875. However, his testimony – even if deemed to be uncorroborated for purposes of this discussion – was not incredible. Lee Ward did testify that he did not see Baca during the physical fight that occurred between himself and Garnica on the one hand and Medina and Gonzales on the other, after the two groups left the Quik Stop Market. RT 455-457. Ward also testified that a third person, who had not been at the confrontation at the Quik Stop, was present at the fight, but ran

before the shooting started. RT 408, 441. However, Ward also testified that he and Garnica were in the thick of the fist fight with Medina and Gonzales when the shots were fired from outside this group of fighters. RT 410-413. This squares with Medina's testimony that he did not see Baca when the first shot was fired but then saw Baca come around the corner, armed, and shoot Garnica. RT 609, 644.

Medina's testimony also was supported by Morales's description of her telephone call with Baca: according to Morales, petitioner told her he was going to "go away for a long time" because he did something wrong. CT 408.

Finally, Medina's testimony was supported by the gang expert, who described Baca as a Norteno, who could have reacted to what he would perceive as Garnica's disrespect to Medina. RT 762, 763.

The Court of Appeal did not apply federal constitutional law unreasonably in rejecting this claim.

V. Inconsistent Verdicts

Ward testified that during the fight following the Quik Stop confrontation, one member of the group attacked him and Garnica threw a beer bottle at him. RT 409-410. He was certain that petitioner did not throw the bottle; his testimony suggested that the third person, whom he was unable to identify, threw the bottle. RT 416.[2] Gonzales's jury found him guilty of the lesser included offense of misdemeanor battery, while petitioner's jury found him guilty of the felony assault with a deadly weapon. CT 765-766, 782. Petitioner argues that the verdicts are inconsistent and that his conviction should be reduced to a misdemeanor.

/////

/////

---

[2] The parties assume that Gonzales threw the bottle. The evidence suggests that both Gonzales and Baca were aiders and abettors to this act. The result, however, does not change whether Gonzales or the third party threw the bottle.

      The Court of Appeal rejected this claim:

> [O]ur system of justice does tolerate inconsistent verdicts by separate juries. Our Supreme Court has abandoned the so-called rule of consistency, which requires virtually automatic reversal of an inconsistent verdict. . . .
>
> [D]efendant contends he cannot be convicted of assault with a deadly weapon when the perpetrator himself was not. He discounts the significance of the separate juries, claiming that the same evidence as to the assault was presented to both juries. We conclude that separate juries can, and in fact did, draw different inferences from the same facts. While one jury concluded that the manner in which the beer bottle was thrown constituted assault with a deadly weapon, the second jury found only a simple assault. As our Supreme Court has recognized, inconsistency is often a tolerable outcome in our system of justice.

Answer, Ex. B at 13-14.

      In Harris v. Rivera, 454 U.S. 339 (1981), the petitioner argued that his constitutional rights were violated when one of his co-defendants, tried at the same time, on the same evidence, before a single trier of fact, was acquitted when he was found guilty on the same evidence. The Supreme Court rejected the challenge, finding no constitutional condemnation of inconsistent verdicts. Id. at 464-65; see also United States v. Powell, 469 U.S. 57, 65 (1984) (as a matter of its supervisory authority over federal criminal trials finding no error in inconsistent verdicts). As one Court of Appeals has recognized, a defendant has "no constitutional guarantee that his jury would reach the same result as prior or future juries dealing with similar facts." Getsy v. Mitchell, 495 F.3d 295, 307 (6th Cir. 2007), cert. denied, __ U.S. __, 76 U.S.L.W. 3469 (Mar. 3, 2008); see also Cortis v. Kenney, 995 F.2d 838, 840 (8th Cir. 1993) (if there is a rule of consistency for verdicts for co-conspirators, it does not apply when they are tried separately). The state Court of Appeal did not apply federal law unreasonably in rejecting this claim.

/////

/////

/////

/////

VI. CALJIC No. 2.90

Petitioner argues that the reasonable doubt instruction given in his case, CALJIC No. 2.90, deprived him of due process and equal protection. The Court of Appeal rejected his attack:

> Defendant claims [relief] is now required by the United States Supreme Court's decision in *Bush v. Gore* (2000) 531 U.S. 98 [148 L.Ed.2d 388] (*Bush*). Not so. In *Victor v. Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 583] (*Victor*), the Supreme Court held: "The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so . . . ." (*Id.* at p. 5.) In *Bush*, the court did not purport to reject *Victor*, nor did it hold that trial courts must define reasonable doubt. . . . .
>
> Rather, in *Bush*, the court majority carefully distinguished the election contest before it from the ordinary case in which a jury evaluates evidence at a criminal trial. . . . .
>
> Simply put, settled case law approves of the definition of reasonable doubt as articulated in CALJIC No. 2.90. Since the same definition is provided to all juries in criminal cases in the State of California, there is no arbitrary distinction made in the instruction, and thus CALJIC No. 2.90 does not offend equal protection.

Answer, Ex. B at 15-16.

The state court did not apply federal law unreasonably in rejecting these claims. First, as it noted, California's reasonable doubt instruction has been upheld against a due process challenge. Lisenbee v. Henry, 166 F.3d 997, 999 (9th Cir. 1999); see also Victor v. Nebraska, 511 U.S. 1, 5 (1994). Second, Bush v. Gore, 531 U.S. 98 (2002), was not a criminal case and did not consider the equal protection problems, if any, arising from the use of California's reasonable doubt instruction; rather, it related only to the specific problems stemming from the 2002 presidential election. Id. at 109 ("our consideration is limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities"). It cannot be clearly established law for habeas purposes.

/////

1   Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

   These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  March 28, 2008.

_____
U.S. MAGISTRATE JUDGE

2

baca0506.157